UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
KATTEN MUCHIN ROSENMAN LLP,          :
                                     :
                Plaintiff,           :    07 CV 2921 (BSJ)
                                     :
         -v-                         :    ORDER
                                     :
KAYVAN HAKIM, YASSMINE HAKIM and     :
GREAT NORTHERN INSURANCE COMPANY,    :
                                     :
                Defendants.          :
------------------------------------ X
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

COPY MAILED / FAXED TO:
COUNSEL FOR PLTFF(S): ___
COUNSEL FOR DFT(S): ___
PLTFF PRO SE: ___
DFT. PRO SE: ___
DATE: 6/9/08
BY: YKL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___
DATE FILED: 6/10/08

Plaintiff Katten Muchin Rosenman LLP ("KMR") filed this interpleader action pursuant to 28 U.S.C. § 1335 for the Court to determine the rights to $150,000 previously deposited in its escrow fund. The adverse claims arise from a dispute over the disbursal of insurance funds pursuant to settlement agreements between Kayvan Hakim and Yassmine Hakim ("the Hakims") and Great Northern Insurance Company ("GNIC"). GNIC brought the instant motion for summary judgment against the Hakims, contending that the Hakims have failed to fulfill their obligations under the agreements as a matter of law, thereby forfeiting their right to the money deposited in the Escrow fund, and against KMR, arguing that the Court should dismiss KMR's claims for indemnity for

KMR's actions as Escrow Agent. For the reasons that follow, GNIC's motion is DENIED in its entirety.

## BACKGROUND

Except as otherwise noted, the following facts are undisputed.

The Hakims purchased a homeowner's insurance policy (the "Policy") from GNIC for coverage of their primary home in New York and their secondary residence in Massachusetts (the "Residence"); this Policy was in effect from December 12, 1997 to December 12, 1998. (GNIC's Statement Pursuant to Local Civil Rule 56.1 ("GNIC Rule 56.1 Statement") ¶ 3.) On September 19, 1998, the Hakims informed GNIC that a fire had occurred at the Residence, destroying both the home and its contents. (Id. ¶ 4.)

The Hakims' Policy provided for Deluxe Coverage of the Residence on an Extended Replacement Cost basis ("Residence Coverage"), and for Deluxe Coverage of the contents therein on a Replacement Cost Basis ("Contents Coverage"). (Id. ¶¶ 5-8.) Although the Residence Coverage had a limit of $209,000, the Extended Replacement Cost provision provided that "[i]f the payment basis is the extended replacement cost, [GNIC] will pay the reconstruction cost even if this amount is greater than the amount of coverage shown in your policy. . . . If you do not

repair, replace or rebuild your house or other permanent structure at the same location or some other location within the Commonwealth of Massachusetts within two years from the date of loss, the payment basis will be verified replacement cost." (Id. ¶¶ 5-6.)  Under the terms of the policy, "verified replacement cost" is "the reconstruction cost of your house up to the amount of the coverage shown in the Coverage Summary," i.e., $209,000.  (Id. ¶ 6.)

The Contents Coverage was limited to $104,500 on a replacement cost basis; under this coverage, "[i]f the payment basis is replacement cost, [GNIC] will pay the full cost to replace the contents . . . up to the amount of coverage."  (Id. ¶¶ 7-8.)  This provision of the Policy also provided that if "after a covered loss to both house and contents, [GNIC] pay[s] more than the amount of house coverage because of extended replacement cost, we will automatically increase the amount of contents coverage for that loss by the same percentage that we increased the amount of the house coverage."  (Id. ¶ 8.)

Following notification of the claim, the parties engaged in negotiations to determine the amount to be disbursed under the Policy.  On December 15, 2003, the Hakims and GNIC executed settlement agreements outlining the terms of the settlement. Under the terms of the agreement determining the payout under the Residence Coverage ("Residence Settlement"), GNIC agreed to

3

pay a total of $788,800, (id. ¶ 9), and pursuant to the agreement determining the disbursement under the Contents Coverage ("Contents Settlement"), GNIC agreed to pay to the Hakims a total of $387,500, (id. ¶ 10). These agreements provided that GNIC would initially provide the Hakims with upfront settlement payments of $230,224.14 and $106,098.85 under the Residence Settlement and the Contents Settlement, respectively. (Id. ¶ 11.) Further, the agreements required that $150,000 be deposited into escrow ($100,000 under the Residence Settlement and $50,000 under the Contents Settlement), to be paid to the Hakims "upon [GNIC's] receipt of an executed contract between the Hakims and a contractor memorializing an agreement to rebuild the Hakims' residence which is the subject of this loss." (Id. ¶ 12.)

These funds were deposited into KMR's escrow account, and were governed by escrow agreements also executed on December 15, 2003, which were expressly incorporated into the Residence and Contents Settlements ("Escrow Agreements"). Under the terms of the Escrow Agreements, KMR was to retain the escrow funds

> in the Escrow Account in accordance with this Agreement and shall disburse the Escrowed Funds to the Hakims at such time as the Hakims have delivered to and [GNIC] has received the Rebuild Contract, as that term is defined in ¶10 of the Settlement Agreement. In the event that the Hakims do not deliver the Rebuild Contract, the Escrow Agent shall disburse the Escrowed Funds to

> [GNIC], unless any adverse claim to the Escrowed Funds has been asserted. In such event, the Escrow Agent shall deposit the Escrowed Funds in a court of competent jurisdiction with respect to such adverse claim(s).

(Id. ¶ 15.) The indemnification provisions of the Escrow Agreements further provided that KMR

> shall not be liable for actions or omissions hereunder, except for its own gross negligence or willful misconduct and, except with respect to claims based upon such gross negligence or willful misconduct that are successfully asserted against [KMR], the Hakims and [GNIC] shall jointly and severally indemnify and hold harmless [KMR] from and against any and all losses, liabilities, claims, actions, damages and expenses, including reasonable attorneys' fees and disbursements, arising out of and in connection with this Agreement.

(Id. ¶ 16.) And in case of resignation or removal of the Escrow Agent, the Agreements provided that

> [s]uch resigning or removed Escrow Agent shall deliver the entirety of the Escrowed funds to . . . any successor Escrow Agent or . . . if it shall not have received any notice of the appointment of such successor within 30 days of its resignation or removal, to any court of competent jurisdiction. Such delivery of the Escrowed Funds shall make effective the resignation or removal of the Escrow Agent, and it shall be thereupon discharged of and from any and all further obligations arising in connection with this Agreement.

(Aff. of Robert Link ("Link Aff.") Ex. 6 (Escrow Agreement § 3.7(d)).)

Approximately a year after the settlement agreements were executed, GNIC contacted KMR (in its capacity as counsel to the Hakims) to ascertain when the Rebuild Contract would be ready. (GNIC Rule 56.1 Statement ¶ 17.)  By letter dated December 13, 2004, KMR responded that "Mr. Hakim has been working with an architect and is in the process of retaining a contractor to rebuild the house.  He expects to do so within the next two months, i.e., by mid-February 2005."  (Link Aff. Ex. 8 (Letter of Michael Gallagher, KMR, to Robert Link dated Dec. 13, 2004).)

The Hakims did not provide a Rebuild Contract by mid-February of 2005, nor within a year thereafter; by letter dated May 8, 2006, GNIC sent a letter to KMR demanding the return of the Escrow Funds.  (GNIC Rule 56.1 Statement ¶ 19.)  GNIC then contacted KMR by telephone at some point around May 8, 2006; during that conversation, KMR asserted that it would commence an interpleader action to determine to whom the Escrow Funds should be paid out.  (Id. ¶ 20.)  By letter dated May 12, 2006, attorneys for the Hakims informed GNIC that "the Hakims fully intend to rebuild the residence that is the subject of the policy and settlement agreements."  (Link Aff. Ex. 10 (Letter of David J. Mark to Lloyd A. Gura dated May 12, 2006).)

By August of 2006, KMR had yet to disburse the Escrow Funds to either party or to commence an interpleader action; GNIC made another demand by letter dated August 24, 2006 that the Escrow

6

Funds be disbursed to it within seven days or that KMR commence an interpleader action, (GNIC Rule 56.1 Statement ¶ 21). In that letter, GNIC further stated its intention to pursue remedies against KMR for what it viewed as its wrongful withholding of the Escrow Funds. (Link Aff. Ex. 11 (Letter of Lloyd Gura to Michael Gallagher dated Aug. 24, 2006).) The Escrow Funds remained deposited in KMR's escrow account.

In February of 2007, GNIC called KMR and informed it that GNIC intended to file a breach of contract and conversion action against KMR for its alleged failure to abide by the Escrow Agreements. (Id. ¶ 22.) By letter dated February 15, 2007, KMR resigned as Escrow Agent effective February 23, 2007 and asked the parties to designate a successor agent. (Id.) GNIC responded by letter dated February 20, 2007, stating that it would not designate a new escrow agent because of its asserted claim to the Escrow Funds, and demanded the return of the funds to it, or the deposit of the funds with a court of competent jurisdiction pursuant to the Escrow Agreements. (Id. ¶ 23.) In response, KMR, by letter dated February 21, 2007, stated its intention to "take steps to deliver the entirety of the escrowed funds to a court of competent jurisdiction" if a successor agent was not named within 30 days of February 23, 2007. (Id. ¶ 24.)

On April 11, 2007, KMR filed the instant interpleader action, but did not deposit the Escrow Funds with the Court,

7

(id. ¶ 25); the Funds were deposited with the Court on May 24, 2007. By letter dated April 2, 2008, counsel for the Hakims notified this Court that "[t]he Hakims have now entered into a Rebuild Contract and have furnished [GNIC] with a copy of same."

**DISCUSSION**

I.  Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "It is the movant's burden to show that no genuine factual dispute exists." Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). Summary judgment is inappropriate if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

II.  The Claims Against the Escrow Funds

GNIC contends that it is entitled to the Escrow Funds as a matter of law because the Hakims' failure to supply them with a Rebuild Contract within a reasonable timeframe constitutes a breach of the Settlement Agreements; although the Settlements do not specify a time for performance of this obligation, GNIC argues that a reasonable time for performance must be implied into the contracts and that the Hakims did not meet this obligation.  Although the Hakims' delay on its face is troubling, this Court cannot, based on the sparse record before it, say as a matter of law that the timeframe was unreasonable.

A.  Performance Within A Reasonable Timeframe as an Implied Duty Under New York Law

"Under New York law, where a contract is silent regarding the time for performance, a duty to perform within a reasonable time is implied unless the parties have specifically negotiated over and rejected that particular contract term."  Smith Barney, Harris Upham & Co. v. Liechtensteinische Landesbank, 866 F. Supp. 114, 117 (S.D.N.Y. 1994) (internal quotations omitted).  "In determining what constitutes a reasonable time for performance, courts consider several factors, including: (1) the nature and object of the contract; (2) the previous conduct of the parties; (3) the presence or absence of good faith; (4) the experience of the parties and the possibility of prejudice or

9

hardship to either one." Id. "The question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury, unless the facts are undisputed, in which case the question becomes one appropriate for summary judgment." Id. (internal quotations omitted; emphasis added).

Although the timeline as enumerated above is undisputed, there simply is not enough in the record regarding the circumstances behind the Hakims' lengthy delay in securing a Rebuild Contract for the Court to substitute its judgment for that of a jury, especially in light of the undisputed fact that the Settlement Agreements do not impose an express deadline for performance. Without more information as to the actions taken by the Hakims and the reasons for the delay in securing the Rebuild Contract, the Court cannot ascertain whether or not the Hakims have been diligent, or have acted in good or bad faith. Cf. Vermont Teddy Bear Co., 373 F.3d at 244 (noting that even an "unopposed summary judgment motion may also fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law" (internal quotations omitted)).

III. KMR's Performance as Escrow Agent

GNIC also contends that as a matter of law, KMR's performance as Escrow Agent, specifically its failure to turn over the Escrow Funds either to GNIC or to a court of competent

10

jurisdiction within a timely fashion, constitutes a breach of the Escrow Agreements that renders the indemnity provisions null. Although the Court also finds KMR's delay in commencing an interpleader action troubling, it cannot say as a matter of law that KMR's actions rise to the level of grossly negligent or willful misconduct as required to nullify the indemnification provision of the Escrow Agreements.

A.  Duties of An Escrow Agent

"An escrow agreement imposes a fiduciary duty on the escrow agent to both parties, not to deliver the escrow . . . except upon strict compliance with the conditions imposed." Carruthers v. Flaum, 450 F. Supp. 2d 288, 317 (S.D.N.Y. 2006). "An escrow agent not only has a contractual duty to follow the escrow agreement, but additionally becomes a trustee of anyone with a beneficial interest in the trust . . . . Thus, an escrow agent can be held liable for breach of the escrow agreement and breach of fiduciary duty as escrowee." Takayama v. Schaefer, 240 A.D.2d 21, 25 (N.Y. App. Div. 2d Dep't 1998). "As a fiduciary, [an escrow agent] ha[s] a strict obligation to protect the rights of both parties." Grinblat v. Taubenblat, 107 A.D.2d 735, 736 (N.Y. App. Div. 2d Dep't 1985) (emphasis added).

KMR's delay in filing the interpleader is problematic in several respects. The undisputed facts demonstrate that GNIC made its position as to its asserted entitlement to the Escrow

11

Funds unequivocal by letter dated May 8, 2006 and that KMR asserted shortly thereafter its intention to commence an interpleader action.  Further, as early as August, 2006, GNIC made clear its intention to pursue remedies against KMR for what it viewed to be its breach of the Escrow Agreements.  And whether or not KMR intended by its delay to favor its former clients, the Hakims, there is on the face of the record a strong appearance of a conflict of interest.

Still, there is not enough evidence regarding the circumstances behind the delay for this Court to decide as a matter of law that KMR cannot benefit from the indemnification provisions of the Agreements.  First, there are no express provisions in the Escrow Agreements denoting a timeline within which an interpleader action must be commenced.  While a reasonable term for performance can be implied into these Agreements, on this record, the Court cannot determine whether KMR's delay in filing an interpleader was reasonable, nor as a result can it determine as a matter of law whether KMR's delay was willful misconduct or was grossly negligent.

**CONCLUSION**

For the reasons above, the Court DENIES GNIC's motion in its entirety.

**SO ORDERED:**

_____
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:   New York, New York
         June 9, 2008